582 A.2d 510

**BALTIMORE COUNTY COALITION AGAINST UNFAIR TAXES et al.**

v.

**BALTIMORE COUNTY, Maryland et al.**

**No. 124, Sept. Term, 1989.**

Court of Appeals of Maryland.

Order Dec. 1, 1989.

Opinion Dec. 4, 1990.

H. Thomas Howell (Thomas M. Trezise, Semmes, Bowen & Semmes, all on brief), Towson, for petitioners.

Michael J. McMahon, Asst. County Atty. and Arnold Jablon, County Atty., Towson, for respondents.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS * and CHARLES E. ORTH, Jr., (Retired) Specially Assigned, JJ.

## ORDER

PER CURIAM.

For reasons to be stated in an opinion later to be filed, it is this 1st day of December, 1989

ORDERED, by the Court of Appeals of Maryland, a majority of the Court concurring, that as to that part of the judgment of the Circuit Court for Baltimore County which declares, in paragraph 3, "That Bill 47–89 is . . . not subject to referendum under the provisions of Charter Sec. 309," the judgment is affirmed with costs. Mandate to issue forthwith.

MURPHY, Chief Judge.

This case involves the referendum provisions of § 309(a) of the Baltimore County Charter and whether a county ordinance, imposing a tax on non-reusable sealed beverage containers, was referable to county voters at the November 1990 General Election.

## I.

Section 309(a) of the Charter reserves to the people of Baltimore County "the power known as 'The Referendum,' by petition to have submitted to the registered voters of the county, to approve or reject at the polls, any enacted law or ordinance or part of any such law or ordinance of the county council." Under this provision of the Charter, if a referendum petition is properly executed and filed, the referred law will not take effect until thirty days after its approval by the voters at the next ensuing General Election.

---

* Adkins, J., now retired, participated in the hearing and conference of this case while an active member of this Court but did not participate in the decision and adoption of this opinion.

These further provisions, which limit the scope of the referendum right, next appear in § 309(a):

"No law making any appropriation for maintaining the county government, or for maintaining or aiding any public institution, not exceeding the next previous appropriation for the same purpose, shall be subject to rejection or repeal under this section. The increase in any such appropriation for maintaining the county government or for maintaining or aiding any public institution shall take effect only as in the case of other laws, and such increase, or any part thereof, specified in the petition may be referred to a vote of the people of the county upon petition as above provided."

The Baltimore County beverage container tax ordinance (Bill No. 47–89) was enacted on June 9, 1989 and codified as Baltimore County Code (1978, 1988–89 Cum.Supp.), Article VIII, §§ 11–68 through 11–72. According to its title, the ordinance was "[f]or the purpose of levying and imposing a two-tier tax on non-reusable sealed beverage containers." Section 11–68 of the ordinance provided that the tax was imposed "upon every distributor who supplies to a dealer in the County nonreusable beverage containers containing beverages as defined [in § 11–69]." The tax imposed was two cents on containers of not more than sixteen fluid ounces and four cents upon containers having a greater capacity. The ordinance required distributors to collect the tax beginning December 1, 1989.

Following passage of the tax ordinance, a petition to refer the law to the county voters under § 309 of the Charter was initiated by a number of entities and individuals (the petitioners). By opinion dated June 9, 1989, the County Solicitor advised the County that the tax ordinance was excluded from referendum under § 309 of the Charter because it was a law making an appropriation for maintaining the county government. Notwithstanding the County Solicitor's opinion, the petitioners circulated a referendum petition entitled "Petition Regarding a New Beverage Container Tax." The petition recited that the tax ordinance provided

"additional tax revenues as part of increased General Fund appropriations included in the 1990 Annual Budget and Appropriation Ordinance of Baltimore County for, among other things, solid waste disposal and the implementation of the tax, such Act levying and imposing a two-tier tax on non-reusable sealed beverage containers as a part of the General Fund."

The referendum petition thereafter set forth the entire text of the ordinance. The petition was executed and filed within the time prescribed by § 309(a) of the Charter and contained the requisite number of signatures to refer the law to the county voters at the November, 1990 General Election.

Based on the County Solicitor's opinion that the ordinance was nonreferable, and thus was not suspended by the filing of the referendum petitions, the County announced its intention to enforce the provisions of the law and to collect the tax. Thereafter, on October 3, 1989, the petitioners sued for declaratory and injunctive relief in the Circuit Court for Baltimore County. They sought a declaration that the tax ordinance, being the subject of a valid referendum petition filed in full compliance with § 309 of the Charter, was without effect, inoperative, and unenforceable unless and until approved by the voters. The petitioners also sought an injunction against enforcement of the ordinance and the collection of the tax pending the result of the vote on the referred law.

Upon the County's motion to dismiss the petitioners' complaint, Judge John F. Fader, II, after an extensive hearing, issued a declaratory judgment on November 11, 1989. He declared that § 309(a) of the Charter "provides that increases in appropriations for maintaining county government are subject to the referendum process"; that § 309 "exempts from the referendum process new or initial appropriations for maintaining county government"; that the ordinance was "a new or initial appropriation bill for maintaining Baltimore County Government," rather than an "increase" in an appropriation; and that consequently the

ordinance was not subject to referendum under § 309 of the Charter. Underlying Judge Fader's declaratory judgment was his expressed belief that

"§ 309 has used the word 'increase' in its sense that it means something in addition to something that has occurred before, and that the initiative, at least initially, belongs to the government to determine how the people's wherewithal shall be taxed. After that initial decision by government as to what should be taxed and how it should be taxed, the people have reserved for themselves in § 309 the power to set to referendum any increase in that initial determination."

Upon petitioners' appeal to the Court of Special Appeals, we granted certiorari prior to argument in that court and advanced the case on the docket to promptly resolve the important issue raised in the case. By per curiam order dated December 1, 1989, a majority of the Court concurring, we affirmed *only* that part of the circuit court's judgment which declared "[t]hat Bill 47–89 is ... not subject to referendum under the provisions of Charter Sec. 309." We now give our reasons for that determination.

## II.

As authorized by Article XI–A of the Constitution of Maryland (the Home Rule Amendment), the Charter Board of Baltimore County was established in 1954 to prepare a Charter for the county. The voters of the county adopted the Charter in 1956. Included within it were the referendum provisions of § 309(a), as to which the Reporter to the Charter Board stated that it "reproduces almost verbatim various provisions of Article XVI of the State Constitution entitled 'The Referendum,' provisions which apply to laws enacted by the General Assembly." The Reporter further stated that "[t]he only minor departure from the constitutional pattern is the provisions relating to the form of affidavit of the person securing the signatures." *See* Proposed Home Rule Charter For Baltimore County, Maryland with Reporter's Notes and Index, April 9, 1955, p. 100.

Article XVI of the State Constitution, in § 1(a), reserves to the people the power "to have submitted to the registered voters of the State, to approve or reject at the polls, any Act, or part of any Act of the General Assembly." Section 2 of Article XVI limits the right of referendum in pertinent part as follows:

"No law making any appropriation for maintaining the State Government, or for maintaining or aiding any public institution, not exceeding the next previous appropriation for the same purpose, shall be subject to rejection or repeal under this Section. The increase in any such appropriation for maintaining or aiding any public institution shall only take effect as in the case of other laws, and such increase or any part thereof specified in the petition, may be referred to a vote of the people upon petition."

As interpreted by our cases, Article XVI, § 2 excepts from the right of referendum a "law making any appropriation for maintaining the State Government"; it authorizes a referendum petition to a law making an appropriation "for maintaining or aiding any public institution," only to the extent of the increase over the next previous appropriation for the same purpose. *See Kelly v. Marylanders for Sports Sanity,* 310 Md. 437, 454, 530 A.2d 245 (1987). As we said in *Kelly,* 310 Md. at 475, 530 A.2d 245, the language in Article XVI " 'not exceeding the next previous appropriation for the same purpose,' refers to laws for maintaining or aiding any public institution, but not to laws making any appropriation for maintaining the State government."

Notwithstanding the Charter Board Reporter's view that the referendum provision of § 309(a) of the Charter was almost a verbatim reproduction of the referendum provision set forth in Article XVI of the Maryland Constitution, § 309 contains more than a minor departure from the verbiage of Article XVI. As already observed, § 309(a) first excepts from the right of referendum a county law making "any appropriation" for maintaining the county government, "or for maintaining or aiding any public institution, not exceed-

ing the next previous appropriation for the same purpose." By its further provisions, § 309(a) qualifies the exception by stating that "[t]he increase in any such appropriation *for maintaining the county government* or for maintaining or aiding any public institution ... or any part thereof, specified in a petition," may be referred to a vote of the people of the county. (Emphasis supplied.)

Article XVI of the State Constitution thus limits the right of referendum as to "any appropriation" to an "increase" over the prior year's appropriation *only* for maintaining or aiding any public institution; it does not permit a referendum as to any increase in an appropriation for maintaining the state government. Section 309(a) of the Charter, on the other hand, purports to permit a referendum petition as to the "increase, or any part thereof," contained in "any appropriation" whether for (1) maintaining the county government, or (2) for maintaining or aiding any public institution which exceeds the prior year's appropriation for that institution.

### III.

The petitioners maintain that nothing in § 309(a) supports the trial court's judgment that new or initial appropriations for maintaining the county government are exempt from referendum. The container tax ordinance, they claim, is a law which increases an appropriation for maintaining the county government within the contemplation of § 309(a). In particular, they argue that § 309(a) permits a referendum of a tax ordinance which generates an increase in revenues to maintain the county government. Although the petitioners recognize that, in a literal sense, a revenue raising tax measure does not qualify, by itself, as an "appropriation," they point out that under our decisions interpreting the referendum provisions of Article XVI of the Maryland Constitution, an appropriation of public funds is made by a legislative enactment whose primary object is to authorize the withdrawal from the treasury of a certain sum of money for a specified public object or purpose.

While they acknowledge that the container tax law does not itself authorize or require withdrawal or expenditure of money, and that the revenues collected under the ordinance are not dedicated to a specific use, object, or purpose, the petitioners emphasize that the ordinance provides a new source of revenue as an "enhancement" of the county's General Fund. They also recognize that an appropriation for maintaining the government is usually found in a budget bill or a supplementary budget bill and not in a law imposing a new tax. Thus, the petitioners reason that if the container tax ordinance is to be regarded as a law making an appropriation for maintaining the county government, it is so classifiable only because of its linkage to the county budget bill as a revenue producing component of the county's General Fund. In this, the petitioners place reliance upon certain of our cases interpreting the referendum provisions of Article XVI, which, they say, hold that revenue raising and budget measures are *in pari materia* and must be construed together as though they constituted one act. As a result, the petitioners argue that a measure providing revenue in support of an enacted budget constitutes a law making an "appropriation" under § 309 of the Charter.

The petitioners contend that the drafters of the Baltimore County Charter were well aware of the essential unity of a revenue ordinance and the budget bill and intended to treat a revenue measure as an integral part of the budget bill; and, consequently, the former must be regarded as a law making an appropriation for maintaining the county government. The petitioners therefore urge that the container tax ordinance is the equivalent of a law making an appropriation for maintaining the county government. They say that § 309(a) excludes from referendum only those laws making an "appropriation" for maintaining the county government which do not exceed the next previous appropriation for the same purpose. In other words, according to the petitioners, the tax ordinance is inextricably linked to the budget; that the ordinance causes an increase in the annual appropria-

tion for maintaining the county government beyond that in the previous year's budget; and that, as to such increase, the tax ordinance is referable in its entirety to the county voters. This is so, the petitioners suggest, because the wording of § 309(a) is different from that contained in Article XVI of the State Constitution, signifying an intentional departure from the provisions of Article XVI. They conclude that the electorate in Baltimore County may petition to referendum a tax measure which yields increased revenue for maintaining the county government by disbursements through the county budget bill.

## IV.

The record discloses that the container tax law was enacted by the County Council on May 30, 1989 and that the annual budget ordinance for the fiscal year ending June 30, 1990 was enacted at approximately the same time. The budget bill contained the appropriations necessary for maintaining the county government for that budget year and was mainly funded by revenues paid into the county's General Fund. The container tax was intended to provide an enhancement of $2,125,000 to the General Fund for FY 1990. This revenue source was was one of a number of sources of revenue calculated to provide a balanced budget while providing the necessary monies to operate the county government.

In his annual Budget Message to the County Council for FY 1990, the County Executive indicated his support for the container tax ordinance, and the revenue produced thereby, which he said would "help offset the ever-increasing costs of solid waste disposal and the cost of a planned recycling effort." In an affidavit received in evidence, the county's Deputy Director of the Budget stated that none of the monies raised by the container tax were earmarked for a separate or special purpose; but that all county tax revenues under the Charter are deposited into the county's General Fund, which constitutes the primary source from which appropriations are made to defray county expendi-

tures for operating the county government. In this regard, the Deputy Director stated that the container tax "constitutes a financial resource which will combine with numerous other sources of revenue so as to generate monies required to balance the budget." He also said that the County Executive's Budget Message with respect to solid waste disposal and a recycling program was "merely justification for that levy; by no means does it set aside those funds for their contribution to a special, or fund other than the general fund." Specifically, the Deputy Director emphasized that "revenue sources required to balance the budget are not connected or related to any dedicated appropriation for solid waste or a planned recycling effort ...; [and] there is no direct causal linkage in the budget between the beverage container tax and the amount of appropriation for refuse collection and disposal." Otherwise stated, the Deputy Director said that the amounts of "revenue needed to balance the budget are simply unrelated to the purpose of any one or more appropriation, but are based upon the total of estimated budget costs ... [and therefore] the container tax has nothing to do with any appropriated project cost, but instead is based solely on the 'bottom-line' estimated expenditures the County will have in FY 1990 with respect to providing service required by law."

Under Article VII of the Charter entitled "Budgetary and Fiscal Procedures," the County budget consists of "the current expense budget, the capital budget and capital program and the budget message, which shall be combined as one document"; it represents "a complete financial plan for the county reflecting all receipts and disbursements from all sources, including all revenues, all expenditures, and the surplus or deficit in all general and all special funds of the county government." § 703. Section 704 requires that all estimated revenues be detailed as to source, and estimated expenditures as to program or project. Under various other provisions of Article VII of the Charter, it is provided that all disbursements of county revenues must be made pursuant to the annual budget ordinance, by budget

appropriation transfers, or by supplementary or emergency appropriation measures.

## V.

The County embraces Judge Fader's determination that the container tax ordinance constitutes a new appropriation, rather than an increase in an appropriation, and for that reason is not referable under § 309(a). The County points to the common dictionary meaning of the word "increase" as an addition or enlargement—"something that is added to the original stock by augmentation or growth." It contrasts this definition with the common meaning of the word "new" as meaning "novel or unfamiliar." Upon this premise, the County maintains that Judge Fader correctly distinguished between a new and an increased appropriation, properly excepting the former from the referendum right under § 309(a) but not the latter.

According to the County, the appropriation process is separated into two steps, *i.e.*, the County Council must first raise the requisite revenues and, second, it must make disbursements through the budget bill. Revenue producing measures and revenue disbursing measures, it points out, must be embodied in separate bills. Section 710(c) of the Charter prohibits the County from appropriating and spending money without simultaneously providing the means to fund such appropriations. Moreover, the County explains that the Charter requires that the proceeds of the tax ordinance be deposited in the general fund and then transferred to legislative objectives in the budget bill or in the amendments thereto.

The County does not suggest that a revenue raising measure, considered *in pari materia* with the budget bill, is not to be classified as an appropriation for purposes of § 309(a). It takes this position without regard to whether the tax ordinance dedicates or earmarks the revenue which it produces for a special or particular purpose, or whether there is a direct linkage between the budget bill and the tax

ordinance. The County acknowledges that the tax ordinance is a part of the "appropriation" package. It simply urges that there is no "increase" in an appropriation referable under § 309(a) due to the enactment of the container tax law, but only a new appropriation on the revenue side. It contends that the $2,125,000 estimated to be received from the tax ordinance was but a part of the overall increase in revenues over the preceding fiscal year. As a consequence, and because the container tax is a new tax, the County argues that an index for comparing increases is lacking, and thus the tax ordinance is exempt from referendum under § 309(a).

Finally, the County points out that the petitioners have petitioned the entire tax ordinance to referendum and not merely the "increase" in an appropriation. It maintains that as § 309(a) does not permit a referendum directed at a new revenue raising ordinance, the petitioners took the wrong ordinance to referendum. It suggests that the petitioners should have undertaken to refer the annual budget bill and sought to strike the increase in budget appropriations attributable to the enactment of the tax ordinance. In this regard, the County advances the notion that only a "line-item" expenditure in the budget bill itself, representing an increase for maintaining the county government, or for maintaining or aiding a public institution, is subject to referendum. The County claims that when—as in the present case—the referendum petition fails to identify the increase with specificity, the petition is invalid.

## VI.

Although Judge Fader was correct in concluding that the container tax law was not subject to referendum under § 309(a), we disagree with his reasoning in arriving at that result.

Prior to the adoption of the Baltimore County Charter in 1956, our cases had considered the meaning of an "appropriation" for maintaining the state government within the

context of the referendum provision of Article XVI of the Maryland Constitution. *Winebrenner v. Salmon,* 155 Md. 563, 142 A. 723 (1928), involved a state statute which increased the gas tax and directed that a special fund be established for the proceeds and expended only for highway construction and maintenance. The issue was whether the statute was subject to referendum under Article XVI.

Prior to the filing of the suit in *Winebrenner,* then Attorney General Robinson opined that the statute was not referable. In 12 Op.Atty.Gen'l 228 (1927), 'he first noted that all disbursements of state revenues are made by either a budget bill or a supplementary appropriation bill. He said that the statute increasing the gas tax was an "appropriation" measure under Article XVI as it imposed a tax from which the revenue required for road construction was to be derived. *Id.* at 234. General Robinson observed that the word "appropriation," in the context of Article XVI, "signifies the act of setting apart or assigning to a particular use or person in exclusion of all other, that is to say, the application to a special use or purpose." *Id.* at 235. The Attorney General said that the exception for appropriation measures contained in Article XVI encompassed "all laws assigning public monies to a particular use or purpose, regardless of whether such law is adequate or legally sufficient to authorize the payment or disbursement of the appropriated monies." *Id.* at 235. Thus, he said that whether the statute sought to be referred "is regarded as separate and distinct from the budget bill or is considered in connection therewith, it must be held to be a law making an appropriation, within the meaning of Article XVI." *Id.* General Robinson concluded that the framers of Article XVI "had in mind that if laws making appropriations for maintaining the State government were subject to the referendum, it would be possible, through the exercise of this power by the people, to cause the State serious financial embarrassment in the performance of its various essential functions." *Id.* at 235–36. Finally, he said that "the broad language of the exception was intended to include all laws

providing revenue for and/or appropriating monies to any organized department of the State ... [for] the exercise of State functions." *Id.* at 236.

In *Winebrenner*, we held, consistent with the Attorney General's opinion, that the statute was not subject to referendum. We determined that the statute was "an appropriation act", and that it satisfied all requirements of a supplementary appropriation bill because it directed the Governor to make the disbursement in the budget bill for road construction. 155 Md. at 567, 142 A. 723.[1] We said that the statute and the budget had to be considered together as though they constituted one act. *Id.* In so holding, we noted that the purpose of the exception for appropriation bills in Article XVI "was to provide against the possibility of the government being embarrassed in the performance of its various functions." *Id.* at 568, 142 A. 723.

*Bickel v. Nice,* 173 Md. 1, 192 A. 777, decided in 1937, involved a state statute authorizing the issuance of state bonds and requiring that the proceeds be applied to the construction of a state office building. Citing *Winebrenner,* we held that the statute, as an appropriation act, was not referable under Article XVI, stating that only an increase in an appropriation for maintaining or aiding a public institution was referable to the voters. We said that "the actuating purpose" for excepting appropriation bills for maintaining the state government from the referendum process was "to prevent interruptions of government." 173 Md. at 10, 192 A. 777.

*Dorsey v. Petrott,* 178 Md. 230, 13 A.2d 630 (1940), involved a state statute dealing with the conservation of fisheries, a function of state government. The inquiry was

---

1. Article III, § 52(8) of the Maryland Constitution authorizes the General Assembly to enact supplementary appropriation bills after the state budget bill has been enacted; such measures must be "embodied in a separate bill limited to some single work, object or purpose" and must provide "the revenue necessary to pay the appropriation thereby made by a tax, direct or indirect to be levied and collected as shall be directed in said bill."

whether the statute was a law making an appropriation for maintaining the state government within the contemplation of Article XVI. In the course of concluding that the statute was a "general law," and thus was referable to the voters, we made a number of observations. We recognized that statutes to raise revenues for constitutionally mandated purposes (*e.g.*, for the School Fund and to discharge the public debt) were not subject to repeal through the referendum process of Article XVI. *Id.* at 240, 13 A.2d 630. We expanded upon this holding by stating:

"Nor is there any sound basis for the construction that a law imposing or providing for a tax levy or other means of raising revenue for the maintenance of the state government is a law referable to the electorate pursuant to the terms of the Referendum Amendment." *Id.*

We recognized in *Dorsey* that the budget bill itself does not provide the means for the raising of the revenue requisite for the payment of the appropriations made; consequently, we explained that money bills or revenue measures must be enacted to supply the funds necessary to meet the appropriations made in the budget bill. *Id.* at 243, 13 A.2d 630. The enactment of such legislation "gains the quality of definiteness, in the sum appropriated and the object to which it is applied, by the budget bill, of which the legislation supplying the money is an associated and necessarily component part of one fiscal system." *Id.* We said it follows "that revenue measures to raise the public funds to pay the appropriations of the Budget Bill are excepted from the operation of the Referendum Amendment, although the revenue thus procured is disbursed by the Treasury through the provisions of the budget without any express authorization in the money bill for its disbursement." *Id.* at 244, 13 A.2d 630. We concluded that "any appropriation of public funds is made by a constitutional mandate or a lawful legislative act whose primary object is to authorize the withdrawal from the state treasury of a certain sum of money for a specified public object or purpose to which such sum is to be applied." *Id.* at 245, 13 A.2d 630.

These cases set forth the law of Maryland at the time the Baltimore County Charter was adopted in 1956. As earlier stated, the Reporter to the Charter Board, in his official Report, said that the referendum provisions of § 309(a) were an almost verbatim reproduction of the referendum provisions of Article XVI with only a minor departure from the "constitutional pattern" and this related to the form of an affidavit. In the Reporter's view, therefore, an "appropriation" measure within the ambit of Article XVI, and under the rationale of our decided cases, excluded a revenue raising measure from referendum, whether considered separately or together with a budget bill appropriation for maintaining the government. The Reporter thus apparently believed that the wording of § 309(a) of the Charter accomplished that same result as to Baltimore County. The importance of the Reporter's role in ascertaining the intention of a Home Rule Charter provision has been noted in our cases; indeed, we have said that the Reporter's notes are a pertinent guide to the intention of the drafters of the Charter. *See Murray v. Director of Planning,* 217 Md. 381, 143 A.2d 85 (1958); *Tyler v. Board of Supervisors,* 213 Md. 37, 131 A.2d 247 (1957).

In proposing the adoption of § 309, the drafters of the Charter were presumed to have knowledge of and acted with respect to prior and existing law. *See In re Ramont K.,* 305 Md. 482, 485, 505 A.2d 507 (1986); *Police Comm'r v. Dowling,* 281 Md. 412, 419, 379 A.2d 1007 (1977); *Harden v. Mass Transit Adm.,* 277 Md. 399, 406–07, 354 A.2d 817 (1976). Nothing in the enactment of § 309 in 1956 suggests a purpose on the part of the drafters of the Charter to depart from the flat holding of our cases that a law imposing or providing for a tax levy for maintaining the government is not referable to the voters. *See Kelly, supra,* 310 Md. at 454, 458, 530 A.2d 245. Indeed, a subsequent charter revision committee "pointed out that [§ 309] closely follows the wording of the Constitution." *See* Minutes of Charter Revision Committee, October 31, 1961, at 5. The Commission on Charter Revision, in discussing § 309 in

1977, and finding it "adequate," discussed only questions of referenda procedure, *e.g.*, the requisite number of signatures, the responsibility for signature verification, and the maximum number of days for signature collection. *See* Minutes, Commission on Charter Revision, September 13, 1977, at 5.

Notwithstanding this background, we are unable to conclude with certainty that the Reporter, the drafters of the Charter, and its subsequent revision committees did not understand the significance of the inclusion and placement of four additional words in the last sentence of § 309(a)—words which, taken literally, permit referenda upon any appropriation increase "exceeding the next previous appropriation for the same purpose," not just for aiding or maintaining any public institution, but for "maintaining the county government" as well. The difference between the last sentence of § 309(a), and that of Article XVI which does not permit a referendum upon increases in appropriations for maintaining the state government, is indeed a most substantial one. There is, however, nothing before us to suggest that the Reporter and the framers of the Charter did not appreciate the distinction between appropriations for maintaining the government and for maintaining public institutions. In *Kelly v. Marylanders for Sports Sanity, supra*, 310 Md. at 475, 530 A.2d 245, we noted, referring to Attorney General Robinson's opinion in 1928, 12 Op. Att'y Gen. at 237, that the "public institution" exception in Article XVI related only to "educational and eleemosynary institutions," sometimes designated as "state-aided institutions." As to these appropriations, we observed in *Kelly* that it was the law of Maryland, as stated by Attorney General Robinson, as follows:

" 'The framers intended that the people should have a check upon the amount of money expended by the legislature for the maintenance or aid of public institutions, not owned or controlled by the State. Such institutions do not necessarily perform governmental functions and are largely supported by private capital. Moreover, they are

not State controlled, although the State is sometimes given a voice in their management. It is, therefore, not improper, when providing a check upon legislative power, to reserve to the people the right to control any extensions or increases of State aid to such institutions. The reference of such increases could not impair the State government in the exercise of its normal functions, whereas appropriations for the executive, legislative and judicial branches of the Government must be provided, in accordance with the financial needs of these departments, without hindrance or delay.' " 310 Md. at 475, 530 A.2d 245.

## VII.

In ascertaining and effectuating the real intention of the drafters of the Charter in the enactment of § 309, we recognize the rule that a plainly worded statute must be construed without forced or subtle interpretations designed to limit its scope. *State v. Intercontinental, Ltd.*, 302 Md. 132, 137, 486 A.2d 174 (1985); *Hornbeck v. Somerset Co. Bd. of Educ.* 295 Md. 597, 619, 458 A.2d 758 (1983). Thus, we may not omit words from a statute to make it express an intention not evidenced in its original form. *In re Ramont K., supra*, 305 Md. at 485, 505 A.2d 507; *Police Comm'r v. Dowling, supra*, 281 Md. at 419, 379 A.2d 1007. On the other hand, while the language of the statute is the primary source for determining the legislative intention, the plain meaning rule is not absolute, as the statute must be construed reasonably with reference to the purpose, aim, or policy of the enacting body. *Tucker v. Fireman's Fund Ins. Co.*, 308 Md. 69, 73, 517 A.2d 730 (1986); *Kaczorowski v. City of Baltimore*, 309 Md. 505, 513, 525 A.2d 628 (1987). Thus, we have said that a statute must be construed in context, because the meaning of the "plainest language may be governed by the context in which it appears." *NCR Corp. v. Comptroller*, 313 Md. 118, 125, 544 A.2d 764 (1988). In this regard, words in a statute must be read in a way that advances the legislative policy involved. *Morris v.*

*Prince George's Co.,* 319 Md. 597, 603–04, 573 A.2d 1346 (1990). Courts may, therefore, consider not only the literal or usual meaning of those words, but their meaning and effect in the context in which the words were used, and in light of the setting, the objectives, and purpose of the enactment. *State v. Intercontinental, Ltd., supra,* 302 Md. at 137, 486 A.2d 174; *State v. Fabritz,* 276 Md. 416, 422, 348 A.2d 275 (1975). Moreover, in such circumstances, courts may consider the consequences that may result from one meaning rather than another, with real intent prevailing over literal intent. *Walker v. Montgomery County,* 244 Md. 98, 102, 223 A.2d 181 (1966); *Truitt v. Board of Public Works,* 243 Md. 375, 394, 221 A.2d 370 (1966).

Giving due regard to these precepts in determining the actual import of § 309(a)'s authorization of a referendum upon an "increase" in any "appropriation," we note that when the Charter was adopted in 1956, as now, § 706(a) provided that funds for maintaining the county government would be "appropriated" through the annual budget bill. This section requires, *inter alia,* that the budget contain a statement "of all revenues estimated to be received by the county during the ensuing fiscal year"; it also provided that the budget bill set forth

> "a comparative statement of the receipts and expenditures for the last completed fiscal year, the estimated receipts and expenditures of the currently ending fiscal year, and the expenditures recommended by the county executive for the ensuing fiscal year *for each program or project which shall be classified by agency, character and object.*" (Emphasis supplied.)

Section 712(a) of the Charter, as originally enacted and now, authorizes "supplementary appropriations" but unlike supplementary appropriation bills under Article III, § 52(8) of the State Constitution, *see* footnote no. 1, *supra,* these county supplementary appropriations could come only "from unexpended and unencumbered funds set aside for contingencies in the county budget." Thus, at the time of its adoption in 1956, an "appropriation" of money to main-

tain the county government could not be made under the
Charter by a separate ordinance which levied a tax and
directed the expenditure of the revenue thereby produced to
a specific object.

■ Viewing the language of § 309(a) in this perspective,
and recognizing the apparent intention of the Reporter and
drafters of the Charter to adhere to the constitutional
model of the referendum process set forth in Article XVI,
we conclude that the "increase" in an "appropriation" refer-
able under § 309(a) would in no event implicate a law which
imposed a tax, *e.g.*, the container tax ordinance. On the
contrary, the "increase" contemplated by § 309(a) as being
subject to referendum is related solely to the provisions of
§ 706(a), which mandate that the budget bill contain a
comparative statement of the appropriations for the cur-
rently ending, and next ensuing, fiscal years by "program
or project ... classified by agency, character and object."
The requirement in § 309(a) that the "increase" in an appro-
priation be "specified in the [referendum] petition" is ascer-
tainable only by reference to items included in the budget
bill itself—that the challenged increase exceeded "the next
previous appropriation for the same purpose" by the
amount stated in the referendum petition. It is only the
"increase" in a project or program, as reflected in the
budget bill, which is referable and not the tax law itself.
The additional revenue produced by that law became part of
the County's general funds, and along with other revenues,
provided the money necessary to make the appropriations
needed to maintain the county government. The County
Executive's statement in his budget message that a need
existed for additional revenue to defray increasing costs of
solid waste disposal, and for a recycling program, finds no
direct expression in the budget bill in terms of an "in-
crease" in an appropriation for that purpose. Actually, the
appropriation in the budget bill for the Department of
Environmental Protection's program for solid waste
management reflects a decrease in the General Fund appro-
priation for the 1990 fiscal year over the preceding fiscal

year of $32,074 (FY 1989 appropriation for this program totalled $1,514,414; FY 1990 appropriation for this purpose was $1,482,340).

It was upon the basis of the aforegoing reasons that we issued our per curiam order of December 1, 1989 affirming the judgment of the Circuit Court for Baltimore County that the container tax ordinance was not subject to referendum under § 309 of the Baltimore County Charter.