641 A.2d 955

**PIER ONE, INCORPORATED**

v.

**DEPARTMENT OF NATURAL RESOURCES.**

**No. 865 Sept. Term, 1993.**

Court of Special Appeals of Maryland.

June 2, 1994.

Warren K. Rich (Richard W. Driscoll, on the brief), Stevensville, for appellant.

Sharon B. Benzil, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief) Annapolis, for appellee.

Argued before ALPERT, FISCHER and MURPHY, JJ.

FISCHER, Judge.

This appeal by Pier One, Inc. (Pier One) is from a decision of the Circuit Court for Queen Anne's County affirming a Final Decision of the Department of National Resources (DNR), appellee.

On October 22, 1990, DNR issued a Site Complaint alleging that "non-water dependent structures, including a storage shed and gas pumps were constructed, and or placed on a floating pier, adjacent to the marina inlet." The complaint further alleged that this activity was in violation of Md.Code (1974, 1990 Repl.Vol.), § 9–104(b) [1] of the Natural Resources Article. [2] The complaint was later amended by deleting the reference to the gas pumps and sought only removal of the dockmaster's office.

Section 9–104(c) reads in pertinent part:

---

1. The correct statutory reference is § 9–104(c).

2. All statutory references in this opinion are to the Natural Resources Article.

(c) Permits—(1) Except as provided in paragraph (2) of this subsection, notwithstanding any other provision of law, the Secretary may not issue a permit under this title for any project involving the construction of a dwelling unit or other *non-water* dependent structure on a pier located on private wetlands. (Emphasis supplied.)

Pier One operates the Pier One Marina located on Kent Island south of the southeast end of the Chesapeake Bay Bridge, between U.S. Route 50 and the Bay Bridge Commercial Airport. The site consists of approximately 47 acres. Situated near the entrance to the marina is floating pier "A," which contains three fuel pumps, a sewage pumpout facility, and a 10' by 18' enclosed structure known as the "dockmaster's office." That structure is the subject of this appeal.

Pier One purchased the marina in 1986 and, during 1986, received final site plan approval from Queen Anne's County to permit the expansion of the marina basin from nine acres to fifteen acres. DNR issued a wetlands permit authorizing the expansion. According to appellant, and not disputed by appellee, included with the permit for the project issued by DNR were drawings of pilings, piers, and slips to be constructed within the expanded marina basin. Again, according to appellant, because the placement of pilings, piers, and slips did not constitute a dredge or fill activity within DNR's regulatory jurisdiction, the permit did not refer to the pilings, piers, and slips.

In September 1990, Pier One placed two gas pumps, a pump-out facility, and a dockmaster's office on the deck of Pier "A." Activities to be conducted from the dockmaster's office include monitoring vessel traffic within the marina basin, providing fuel to boaters, sanitary sewage pump-out facility operations, and other marina services. Because the dockmaster services the gas pumps and oversees the pump-out facility, the office is located adjacent to those operations. In addition, the dockmaster's office houses electrical shut-off switches for the fuel pumps, the emergency master shut-off

switch for fuel flow from the tanks located on shore, and containment booms and absorbent pads for oil or gas spills.

On October 22, 1990, DNR issued a site complaint, which reads:

Mr. Bingham found that between April 19, 1990 and the date of this Order, that dredging had occurred without a valid wetland license in tidal wetlands at or adjacent to your property known as Pier One Marina, in Queen Anne's County, Maryland. This is in violation of Title 9–202(a) of the Annotated Code of Maryland 1990 Replacement Volume. Between April 19, 1990 and the date of this Order, it was also found that non-water dependent structures, including a storage shed and gas pumps were constructed and or placed on a floating pier, adjacent to the marina inlet. This is in violation of Title 9–104(b) of the Annotated Code of Maryland 1990 Replacement Volume.

Initially, at the hearing before the Administrative Law Judge (ALJ), heard on February 28, 1991, the parties stipulated that the wetlands at issue are private wetlands. Mr. Bingham, the inspector who issued the citation, testified before the ALJ, and it is clear that he issued the complaint pursuant to § 9–104(c).

Before the ALJ, the DNR argued that the structure in question was a non-water dependent structure, and that § 9–104 provides the basis for the complaint. Appellant argued that the structure was, in fact, a water dependent structure and, as such, § 9–104 was inapplicable. In addition, appellant pointed out that COMAR Regulation 08.05.07.03(c) permits certain structures to be built without notice to DNR. These structures include walkways, footbridges, duckblinds, docks, boathouses, boat shelters, and other similar structures.

In her decision, rendered on May 16, 1991, the ALJ stated that a telephonic prehearing conference was held on January 31, 1991, at which time the scope of the hearing was narrowed to the dockmaster's office, the non-water dependent uses having been removed from the premises. In addition, in her

findings of fact, the ALJ found that the drawings associated with the 1991 Wetlands permit show the dockmaster's office.

In her conclusions of law, she noted that § 9–303 was amended in 1989. "Of special significance to the instant case, the General Assembly specifically provided at that time:[3]

'[T]he exemptions from certain permit requirements provided by this Act may not be construed as applying to the construction of a dwelling unit or structure on a pier, wharf, dock, walkway, bulkhead, breakwater, pile or other similar structure.'

1989 Md.Laws Ch. 691, Section 2."

The ALJ found that the construction of a structure on a pier is subject to the Department's permitting requirements and found that, because appellant did not obtain a permit, it violated §§ 9–104 and 9–301 *et seq.* The ALJ subsequently found that the dockmaster's office was a water dependent structure and recommended that the site complaint be withdrawn. On May 30, 1991, both Pier One and DNR filed exceptions to the Recommended Decision. The matter was then reviewed by the Director of the Water Resources Administration.[4] The Director's Final Decision rejected the ALJ's

---

**3.** We do not believe the passage of the amendment in 1989 Md.Laws Ch. 691, Section 2 has any particular significance to the issues in this case. Section 9–303 lists certain permitted uses which are lawful on private wetlands. None of the uses enumerated are relevant to the issues in this case. The amendment was added as a caveat to 9–303.1 which states, "Notwithstanding any other provision of law, a landowner shall be exempt from all local permit requirements to perform maintenance and repair of a bulkhead." We read 9–303.1 in conjunction with 1989 Md.Laws Ch. 691, Section 2 to mean that an exemption from permit requirements for the repair of a bulkhead cannot be expanded to permit a structure.

**4.** The Water Resources Administration is part of the Department of Natural Resources. § 8–201(a). The Director of the Water Resources Administration is appointed by the Secretary of the Department of Natural Resources. § 8–201.

recommendations and found that the site complaint was properly issued pursuant to §§ 9–104 and 9–306.[5]

The Director found that § 9–104 "subjected structures on docks to regulatory review under the Natural Resources Article Title 9 which became effective July 1, 1989." The Director concurred with the ALJ in finding that § 9–104 subjected construction of the dockmaster's office to regulatory review, but disagreed with her recommendation that the complaint be dismissed. The Director found that the question of water dependency should be addressed on a case by case basis, and, therefore, appellant could only come into compliance by obtaining a permit or removing the structure.

The Director's order is as follows:

Pier One shall either:

a) within 30 days from the date of this Decision and Order, apply for a permit under Natural Resources Article, § 9–306, for authorization to leave the dockmaster's office on the dock, which authorization will be granted only if the Tidal Wetlands Division of this Administration determines that the dockmaster's office is a water dependent structure; or

b) if no application is made within 30 days, remove the dockmaster's office within 45 days of the date of this Decision and Order.

The matter proceeded on appeal to the circuit court, and, after a full presentation of legal arguments on December 16, 1992, the circuit court held, in an oral opinion issued the same day, that the issue was very narrow: "that issue being simply whether or not the Director was correct when she concluded that she had jurisdiction with respect to what was on the piers." In this regard the court stated:

I cannot read 9–306(a) in any other manner than saying that any person proposing to conduct on any wetland an activity not authorized by the regulations, and those regulations

---

5. Section 9–306(a) provides, in pertinent part: "Any person proposing to conduct on any wetland an activity not authorized by the regulations adopted under the provisions of § 9–302 of this subtitle shall apply for a permit with the Secretary on the form the Secretary prescribes."

relate to dredging, filling, removing or otherwise altering or polluting private wetlands, under the provisions of 9–302, shall apply for a permit with the Secretary.

Now, the appellant reads 9–302 as very sweeping and setting the authority, the entire scope of the authority of the Department. I simply don't read it that way. Those are regulations which relate to one aspect of what might take place on State wetlands—one, and one only. Well, they are related. Actually, there's one, two, three—three specific— dredging, filling and removing, and then, or otherwise alter- ing or polluting private wetlands. After that, if you want to do any other activity, then you have to get a permit. It could be that those regulations would say that you could put out a pier, for which you would need no permit. Those regulations could just as easily say you can put out a pier that has no structure on it without a permit, but you cannot put a pier out with a structure on it unless you do get a permit. There are myriad possibilities, and I simply don't think that the State, by any stretch of the imagination, did not give to the Secretary the authority to regulate anything conducted on any wetland. And, on, there, is used in its most expansive sense, meaning on, over, above or whatever. I think this intention of the General Assembly is made clear by its adoption of Section 9–104, which says the Secretary may not issue a permit for any project involving the con- struction of a dwelling unit or other non-water dependent structure on a pier located on a private wetland.

Now, if the authority of the Department or the Secretary was nonexistent in that regard before, it certainly was strange in the extreme to prohibit the Secretary from issuing a permit under this Title for any project involving the construction of certain types of units, and that's all that that Section purports to do. And therefore, so far as the conclusion of the Secretary or the Director here with regard to her authority, I have no trouble with that, whatsoever, that the authority to regulate anything on a wetland in- cludes what was on a pier on a wetland, or whatever.

It is clear that the trial judge found jurisdiction in the DNR and that jurisdiction was based upon his reading of § 9–306(a) which reads, in pertinent part:

Any person proposing to conduct on any wetland an activity not authorized by the regulations adopted under the provisions of § 9–302 of this subtitle shall apply for a permit with the Secretary, on the form the Secretary prescribes.

The trial judge found that § 9–104 did not confer jurisdiction on the DNR saying that it "prohibit[s] the Secretary from issuing a permit under this Title for any project involving the construction of certain types of units, and that's all that Section purports to do." He did find that the enactment of § 9–104 evidenced the fact that the General Assembly believed construction on private wetlands required a permit prior to the enactment of § 9–104.

Before the ALJ, DNR took the position that Pier One was in violation of § 9–104(c) because the dockmaster's office was a non-water dependent structure and was not permitted pursuant to the clear mandate of § 9–104(c).

The primary issue argued before the ALJ was whether the dockmaster's office is a water dependent structure. The ALJ found that the structure at issue "is indeed water dependent within the meaning of Section 9–104(c), and is capable of being permitted." Accordingly, the ALJ recommended that the Administration vacate and withdraw the site complaint.

In her Final Decision, the Director of the Water Resources Administration agreed with the ALJ's findings of fact and also with her conclusions of law with the exception of "the disposition of the Site Complaint SC–0–91–0064 vis á vis the dockmaster's office." The conclusion of the Director is that § 9–104 "clearly subjected 'construction of a dwelling unit or structure on a pier, wharf, dock, walkway, bulkhead, breakwater, pile, or other similar structure,' to regulatory review under Natural Resources Article, Title 9. ... It is sufficient to reiterate that after July 1, 1989, Pier One was required to have wetlands permit under Natural Resources Article § 9–306, in order to legally construct the dockmaster's office."

The Administration, therefore, took the position that § 9–104, which is entirely void of any reference to water dependent structures and refers exclusively to non-water dependent structures, somehow requires appellant to obtain a permit pursuant to § 9–306 for what the ALJ found to be a water dependent structure.

In her Final Decision and Order, the Director ordered Pier One to apply for authorization to leave the dockmaster's office on the dock. If the Administration determined that the office was a water dependent structure, it would remain; if the Administration determined that it was not water dependent, it must be removed.[6]

It is noteworthy that the Director predicated her decision in part on § 9–306, a provision that had not previously been relied upon by DNR as giving it jurisdiction.

The DNR argued before the trial court that it had never taken the "expansive interpretation" of § 9–306 that the court put forth. When asked where the DNR found jurisdiction, counsel for DNR replied that to deny such jurisdiction creates a nullity of § 9–104. When pressed, DNR also stated that "we're covered under 9–302."

We believe the DNR is correct in not embracing the interpretation of § 9–306 espoused by the trial judge. While the language of § 9–306, taken literally, indicates that any person proposing to conduct an activity on a wetland shall apply for a permit, it could not mean that any activity whatsoever in any wetland would require a permit. That interpretation is an obvious absurdity. It would mean that even a person engaged only in bird watching would need a permit to do so. We reject the notion that the General Assembly intended by these statutes to give such broad scope of authority to the DNR.

---

6. Appellee advised us in its brief that, on April 16, 1992, Pier One applied for a permit for the dockmaster's office. The permit was granted but only for a building of 48 square feet in lieu of the 180 square feet contained in the existing building. Pier One has appealed that decision and it is now held in abeyance pending the outcome of this case.

We note that DNR itself has never claimed such authority; indeed, it denied it had such authority to the trial judge and to this panel on appeal.

In *Randall Book Corp. v. State*, 316 Md. 315, 324, 558 A.2d 715 (1989), the Court of Appeals stated, "As helpful as the various rules of statutory construction may be in determining legislative intent, perhaps the soundest guidance comes from the Supreme Court's admonition that we give the language of a statute a 'commonsensical meaning.' *United States v. Universal Corp.*, 344 U.S. 218, 221, 73 S.Ct. 227, 229, 97 L.Ed. 260 (1952)." Judge McAuliffe writing for the Court of Appeals in *Cunningham v. State*, 318 Md. 182, 185, 567 A.2d 126 (1989), observed, "In attempting to determine legislative intent, we look first to the words of the statute, read in light of the full context in which they appear, and in light of external manifestations of intent or general purpose available through other evidence." Where the words of a statute are susceptible of more than one meaning, the court should adopt the construction that is in harmony with its general purpose. *Baltimore County Coalition Against Unfair Taxes v. Baltimore County*, 321 Md. 184, 582 A.2d 510 (1990). "[U]nreasonableness of the result produced by one alternative possible interpretation of a statute is reason for rejecting that interpretation in favor of another which would produce a reasonable result." *D & Y, Inc. v. Winston*, 320 Md. 534, 538, 578 A.2d 1177 (1990), quoting 2A *Sutherland Statutory Construction*, § 45.12 (4th ed. 1984). The real legislative intention will prevail over the intention indicated by the literal meaning of the words. *Potter v. Bethesda Fire Dept.*, 309 Md. 347, 353, 524 A.2d 61 (1987).

It appears to us that the apparent difficulty with understanding the import of § 9–306 is that the statute cannot be read in isolation. When considered and read in harmony with § 9–302, however, it makes perfect sense. The scope of § 9–302 is to grant DNR power to make regulations governing dredging, filling, removing, or otherwise altering or polluting

private wetlands. Pursuant to that authority, the Department adopted COMAR 08.05.07.02, which reads in pertinent part:

The following uses are permitted in private wetlands if otherwise permitted by law:

C. (1) The construction and maintenance of walkways, foot bridges, duckblinds, docks, boathouses, boat shelters, and other similar structures, provided that the structures are so constructed on pilings as to permit the unobstructed flow of the tide and preserve the natural contour of the private wetland.

In our opinion, that part of § 9–306 that refers to "an activity not authorized by the regulations adopted under the provisions of § 9–302" refers to an activity associated with "dredging, filling, removing, or otherwise altering or polluting private wetlands." We, therefore, hold that § 9–306 requires that a permit be obtained whenever a person is engaged in any activity involving "dredging, filling, removing, or otherwise altering or polluting wetlands," which the DNR has not already authorized by regulation. This interpretation is consistent with long standing administrative interpretation by DNR and with the position taken by DNR in this case with respect to § 9–306.

We now turn to § 9–104. It is clear from the legislative history of § 9–104 that this section was enacted to plug what was perceived as a loophole in the critical area legislation. Some members of the General Assembly became alarmed with respect to the construction of large non-water dependent structures on piers in Baltimore City. Section 9–104 was enacted to attempt to prevent more of these projects.

Section 9–104(c), by its own terms, limits its applicability to non-water dependent structures. It states in pertinent part, "the Secretary may not issue a permit under this title for any project involving the construction of a dwelling unit or other non-water dependent structure on a pier located on private wetlands." DNR's position is that by stating a permit may not be issued for a non-water dependent structure, by implication, this section requires a permit for a water dependent

structure. We believe that this leap in logic is untenable. The General Assembly certainly knows how to make its intentions known more clearly than in the nebulous, oblique manner suggested by DNR.

DNR argued and the trial judge agreed that, by not giving the interpretation advocated by DNR, § 9–104 would be a nullity. We do not agree. Section 9–104 was enacted to prevent the construction of large scale housing projects. Already existing developments on piers and similar future projects were considered as under the jurisdiction of DNR and subject to permit approval because of their potential for pollution or the existence of dredging or filling. Taking this into consideration, § 9–104 does exactly what its proponents desired. It prevents the issuance of further permits for non-water dependent structures on piers.

### Summary

Prior to the enactment of § 9–104, DNR did not attempt to assert jurisdiction over private wetlands except with respect to the authorization granted by § 9–302. This section grants authority to DNR to regulate dredging, filling, removing, or otherwise altering or polluting private wetlands. This grant of jurisdiction is rather inclusive since it is difficult to conceive of a substantial activity which does not implicate DNR's grant of authority. Following the enactment of § 9–104, DNR believed that that enactment gave it authority over the placement of both water dependent and non-water dependent structures on piers.

■ We do not believe that § 9–104 has the effect of giving DNR authority over water dependent structures on piers. Therefore, the situation existing now with respect to water dependent structures on piers is what it was prior to the enactment of § 9–104.

■ The promulgation of COMAR Reg. 08.05.07.03(c) by DNR permits the construction of structures on piers such as, among other things, boathouses, boat shelters, and other

similar structures. It seems apparent that the dockmaster's office in the case at bar is such a structure.

 For the aforegoing reasons we must reverse the circuit court and direct that the circuit court order the Director of the Water Resources Department to withdraw Site Complaint No. SC–0–90–0064.

**JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR QUEEN ANNE'S COUNTY WITH INSTRUCTIONS TO REMAND TO THE DIRECTOR OF THE WATER RESOURCES DEPARTMENT FOR THE WITHDRAWAL OF SITE COMPLAINT No. SC–0–90–0064.**

**COSTS TO BE PAID BY APPELLEE.**